No. 2268

Second Circuit Appeal

HANS CARL HANSEN AND WIFE v. THE OHIO OIL COMPANY

(June 6, 1925, Opinion and Decree)

(*Syllabus by the Editor.*)

1. **Louisiana Digest—Master and Servant—Par. 160.**

Under the Workmen's Compensation Act, Section 8, subsection 2 (g) of Act .20 of 1914 as amended by Act 43 of .1922, where it is proven that the deceased had been away from his family ten years and during that time had sent them the equivalent of $30.00 as presents, the father will not be entitled to recover compensation, he not having been dependent on the deceased employee to any extent for support.

2. **Louisiana Digest—Master and Servant—Par. 160.**

Under the Workmen's Compensation Act, Section 8, subsection 2 (g) of Act 20 of 1914 as amended by Act 43 of 1922, where the plaintiff, the father of the deceased bought a residence about a year before the son, the employee, was killed, even though the father expected the son to help him pay for it, if the son did not actually aid his father he cannot recover compensation for the death of his son.

3. **Louisiana Digest—Alimony—Par. 1.**

Under Article 229 of the Civil Code children are bound to maintain their father and mother who are in need. Where it is proven that the father and mother were not in need this Article does not apply.

4. **Louisiana Digest—Master and Servant—Par. 160.**

Under the Workmen's Compensation Act, Section 8, subsection 2 (g) of Act 20 of 1914 as amended by Act 43 of 1922, where the father is earning a salary sufficient not only to take care of himself and family in the station in which they live in Denmark but sufficient to take care of reasonable payments on the property which he has purchased, he will not be entitled to recover compensation for the death of this son.

Appeal from Third Judicial District Court of Louisiana, Parish of Claiborne. Hon. J. E. Reynolds, Judge.

This is a suit brought by the father of an employee who was instantly killed while performing services arising out of and incidental to his employment. There was judgment for plaintiff and defendant appealed.

Judgment reversed.

Fields and Blackshear, of Farmerville, and Scarborough and Carver, of Natchitoches, Huey P. Long, of Shreveport, attorneys for plaintiffs, appellees.

Smitherman, Tucker and Mason, of Shreveport, attorneys for defendant, appellant.

ODOM, J. Fred Jenet, a young man about 26 years old, possibly a little older, was employed by the Ohio Oil Company as a pumper at a weekly wage of $37.50.

On the morning of October 4, 1922, he was instantly killed while performing services arising out of and incidental to his employment. He was never married and therefore left no widow or minor child or children. This suit is by his father and mother, who live in Denmark, to recover 60% of his wages for 300 weeks on the ground that they were at the time of his death actually dependent on him for support.

The defense is that plaintiffs were not at the time of their son's death dependent on him for support to any extent.

There was judgment in the lower court in favor of plaintiffs, from which defendant has appealed.

OPINION

Plaintiffs, Hans Carl Hansen and his wife, Johanne Sofie Henriette Hansen, are residents of Denmark, where they have always resided. They were married in the year 1895, and of their union were

born six children, the oldest of whom was Fred Jenet, who was accidentally killed while at work for defendant on October 4, 1922. Their other five children are living in Denmark. The two oldest are 25 and 24 years old, respectively, and are earning salaries, one of 3000 kronen and the other of 1500 kronen per annum, and are therefore not dependent upon their parents for support. The other three children are 15, 14 and 11 years old, respectively; are living with their parents and dependent upon them for support.

Hans Carl Hansen, the father, is 54 years old and in good health. His wife is 50 years old and is also in good health.

The father, the head of the family, is now employed and has been for many years, as a sausage maker. The testimony, which was taken by commission in Denmark, shows that he holds a responsible and important position in sausage factories there corresponding to what we term superintendent. He is what they term a "boss sausage maker." He superintends the making of sausage in some six or seven factories and has about fifty men under him. He is not classed as a common laborer but he himself says that he is in a class by himself. He gets a much higher salary than a common laborer. He is evidently a very competent man in his line. In 1913, 1914 and 1915 he drew a salary of 1940 kronen per annum; in 1916, 1917 and 1918 his salary was 3320 kronen per annum; and in 1919 it was raised to 5000 kronen per annum, and that was his salary in October, 1922, when his son was killed. Whether his salary was increased to meet the high cost of living or whether his services were growing more valuable to his employers and on that his salary was raised, is not shown by the evidence, but we gather that he was above the average in his line and that the salary which he was drawing was considered a good one.

It is shown, for instance, that good carpenters draw 4500 kronen; railroad clerks and conductors 3500 kronen; brickmasons, 4000 kronen, and printers, 4000 kronen; and that other men engaged in the same line of work as plaintiff, that is, sausage makers, receive much less salary than he did. However, it is shown that in order to hold the position which the plaintiff held, it was necessary for him to live in a better residence than was necessary for common laborers. Just what the added expense was for such a house as plaintiff is required to keep is not shown by the testimony.

Subparagraph (g) of paragraph 2 of Section 8 of Act 20 of 1914 provides that in case of the death of an employee:

"If there be neither widow, widower or child, then to the father or mother of the deceased employee, if actually dependent on the deceased employee to any extent for support at the time of the injury and death, 30 per centum of wages. * * *

In this case there is but one question to be determined; and that is, whether the plaintiffs, the father and mother of Fred Jenet, were, at the time of his death, actually dependent on him to any extent for support.

In order to ascertain whether or not these plaintiffs were dependent to any extent for support upon their son, it is necessary, of course, to ascertain the income of the plaintiffs and their expenses. We think that only conditions which prevailed in Denmark, where these plaintiffs lived at the time of the death of their son, are to be taken into consideration. There was considerable testimony adduced to show the difference between the cost of living in Denmark and in America at that time, and to show what the salary of the father

amounted to in American ·money. We think all that testimony entirely irrelevant

The plaintiffs base their right of recovery upon the proposition that they were at the time of their son's death actually dependent on him for support. If they were, they should recover, of course, and we think the conditions in Denmark must be inquired into in order to ascertain whether or not as a matter of fact they were dependent upon him to any extent.

As stated, the plaintiff, that is, the father, was earning at the time of the death of the son 5000 kronen per annum.

As to the cost of living in Denmark, we have the testimony of the plaintiff and his wife and that of J. F. Malmros and M. Nissen Petersen, the two latter being residents of Denmark and well acquainted with plaintiffs and their family.

The plaintiff was asked to give a statement of the family budget as of October 4, 1922, the date on which his son was killed, showing the amount of salary he received, the amount set apart for rent, for food and for clothing, and he stated that his salary was 5000 kronen per annum; that he set apart 1600 kronen for rent, 2200 kronen for food and 400 kronen for clothing, making a total of 4200 kronen. He would, therefore, have left out of his salary 800 kronen, or about one-sixth thereof. He does not state what other expenses he had, but he undoubtedly had some.

J. F. Malmros testified that he had a wife and child and that he paid 500 kronen ·for rent, 350 kronen for clothing and 2000 kronen for food. He draws a salary of 3500 kronen per annum. He says that in that country they figure one-fifth or one-sixth of a man's income for rent, the amount depending upon the size of the family.

M. Nissen Petersen testified that he is ·a printer by trade and gets ·a salary of 4000 kronen per annum. He pays 350 kronen for rent, 500 kronen for clothing and 2200 kronen for food. He has a wife and one child.

These latter witnesses say that plaintiff could live comfortably on the salary which he received but could not save anything.

It would therefore appear from the testimony of plaintiff and his wife and that of the other two witnesses that the parents, the plaintiffs in this case, were not, on October 4, 1922, the date of the death of their son, dependent on him for support to any extent. It would appear that his salary of 5000 kronen was sufficient to take care of all his expenses, allowing an exceedingly large estimate for rent, which he says he budgeted at 1600 kronen per year.

Common experience teaches that the items of rent, food and clothing are the principal ones in the family expense. However, there are other expenses, which, of course, have to be taken care of, such as those for light, fuel, taxes, medicine and laundry. But, as was seen, after paying, or rather after setting aside 1600 kronen for rent, 2200 kronen for food and 400 kronen for clothing, the plaintiffs had 800 kronen per annum left, which we imagine should be sufficient to take care of the other expenses.

Mr. H. Miller, who is secretary to the Danish Consul and resides in the city ·of New Orleans, was called as a witness and was questioned with reference to conditions in Denmark in the year 1922. According to the testimony, a salary of 5000 kronen was not sufficient to support a family of five in October, 1922. According to his testimony, the living expenses of the plaintiffs and their family at that time would have been· approximately 5500 kronen. He furthermore says that a man with a small family could not live there at that time on a ·salary of 4000

kronen. In another place he says that a man getting a salary of 4000 kronen and with three children would be very poor.

We cannot attach much importance to the testimony of Mr. Miller for the reason that, according to what he states about the condition of the laboring classes there, quite a large percentage of the laborers would be dependent on charity for support.

The testimony shows, for instance, that conductors and railway clerks receive a salary of 3500 kronen per annum; that printers and bricklayers receive 4000 kronen per annum, and that it is only skilled laborers who receive in excess of 4000 kronen per annum.

If Mr. Miller's testimony that the average family cannot live on less than 4000 kronen per annum is correct, then it is difficult to see how those who receive a less sum live.

In this connection Mr. Miller refers to a table which was filed in evidence showing the cost of living of a laborer's family of five persons in July, 1922. That table shows that for food such a family would spend 1745 kronen per annum; for clothes, shoes and laundry, 587 kronen; for rent, 443 kronen; for fuel and light, 301 kronen; for taxes, subscriptions, etc., 535 kronen, and for all other expenses, 376 kronen, making a total of 3987 kronen.

Mr. Miller, in his testimony, states that these figures are somewhat exaggerated as they are taken from tables or from schedules which are made out by the laborers themselves, who think it to their advantage to make the figures, or rather to make the estimates larger than their real necessities.

Of course, we are unable to say just what it would cost plaintiff to live a year, but taking his own estimate of his expense, and taking the estimate shown on the table above referred to, it is perfectly evident that all of his salary of 5000 kronen was not consumed in living expenses.

Taking the table above referred to as too high an estimate, let us assume that the cost of living for a family of five in Denmark in 1922 was 3750 kronen per annum. This table includes all expenses. According to that the plaintiff would have left out of his salary 1250 kronen per year. Therefore he was not dependent upon his son to any extent for support.

But it is shown that in the year 1921, the exact date not being stated, plaintiff purchased a residence for 22,500 kronen and paid in cash on the date of the purchase 1000 kronen, leaving a debt of 21,500 kronen which he had to pay.

It is plaintiff's contention that he was dependent upon his son for assistance to pay this debt. It is not contended by plaintiff and his wife, as witnesses, that they were dependent on the son for support, that is, so far as the family expenses were concerned. They were asked to state to what extent they were dependent on him for support and the father answered: "The debt of the property of 21,500 kronen." Therefore, if they had not purchased this property, and if they had not incurred the debt for the property, the father could have paid all of his expenses according to the table above referred to and have left from his salary 1250 kronen per year.

Under such conditions it could not be said, of course, that the father and mother were dependent to any extent upon the son for support at the time of his death.

But it is urged on behalf of the plaintiffs that inasmuch as they had purchased this residence and had on that account become involved in debt, they were dependent on their son to assist them in discharging this debt, even though they were not in fact dependent upon him for support.

But we do not find that plaintiffs were dependent on their son for assistance to

pay for their residence. We are not informed as to how long they were given in which to pay the balance of the purchase price of the property which they bought, but from the fact that they were required to pay less than one-twentieth of the price in cash on the date of the purchase and from the further fact that plaintiff had no property prior to his purchase and therefore no additional security to give for the balance of the price, we think it reasonable to assume that credit is easy in Denmark and that the annual payments are not heavy.

Now the father is earning 5000 kronen per year. He says that he budgets 1600 kronen for rent, 2200 kronen for food, and 400 kronen for clothing, leaving 800 kronen to pay his other expenses. Since he now owns his own home, he does not have to pay rent and therefore he can apply the 1600 kronen which he would otherwise have to pay as rent as a payment on the property.

The record shows that he leases a portion of this residence for 400 kronen per year, which, added to the 1600 kronen, makes 2000 kronen at least available with which to keep up the payments on his house, assuming, of course, that the 800 kronen would pay his other expenses.

If we take the table of living expenses in Denmark in July, 1922, as being approximately correct, the plaintiff would have left from his salary the sum of 1250 kronen and an income of 400 kronen from rent, making a total of 1650 kronen per annum left out of their total income after paying all living expenses, including taxes on the property.

As stated, we are not advised as to what amount it is necessary for plaintiff to pay on his property each year, but it would seem that 1650 kronen would be sufficient for that purpose. If this amount was not sufficient, they should have shown it. The burden was on them. They are found to have a considerable sum, just a little less than one-third of their income, over and above their living expenses. They should have accounted for that sum. They have failed to do so. If, as a matter of fact, they stood in need of help from their son, they should have shown the conditions that made that help necessary. As it is, they come before the court asserting dependence upon the sole ground that they had purchased a home on terms of credit and that they had expected their son to help pay for it. But they have not shown that they were dependent on him for such help.

If the father were an old man, in bad health, and whose strength was on the wane, and whose earning capacity is likely to decrease at an early date; or if the mother were old and out of health, it might be said that they could not reasonably expect to be able to pay for the house they had bought and therefore stood in need of help from their son. But the father is only 54 years old, in good health, with no indications, so far as the record shows, that his salary will grow less in the immediate future. He is not a common laborer. He is a master butcher. He superintends the making of sausage in several factories and has something like fifty men under him. There is no indication that he will lose strength at an early date or that he will lose his position. He is therefore in position, it seems to us, to be able to pay for his home without assistance.

In this connection it may be remarked that Mr. Miller, whose testimony has been referred to above, states that laborers in Denmark are not able to command good salaries after they pass the age of 35 or 40 years. He says the tendency is to replace old men with young men. However, with reference to the plaintiff, he says he

should expect to draw a salary of 5000 kronen for a number of years yet, although he does not state for how long.

Plaintiff is not a common laborer but, as stated, is placed in the class of skilled laborers, without any heavy manual labor to perform; and even if common laborers do begin to grow weak at 35 or 40 years, we see no reason to suppose that the plaintiff will at an early date lose his earning capacity.

And regardless of what Mr. Miller says, the plaintiff and his wife do not claim for themselves that they are growing weak or that they anticipate that the head of the family will soon lose his earning capacity.

In this connection it may be remarked that of their five children two are over age, one 25 and the other 24 years old; one earning 3000 kronen and the other 1500 kronen per annum; the other three are living with their parents and range, in ages, from 11 to 15 years.

Plaintiffs testify that they expected assistance from their son; that he had written them that he would help them pay for the house. One of the other witnesses says that he saw a letter from him to his parents in which he stated that he would help them. But strange to say plaintiffs were not able to produce any of the letters in which their son had promised such support. Mrs. Pugh, a lady with whom the deceased boarded at the time of his death, testified that it was her understanding that he was helping his family, and she thought he had sent them money and was assisting them. She says she got her impression from what he said. But evidently she had misunderstood him and was under a wrong impression, because the testimony of his parents shows that he had contributed absolutely nothing to their support.

Mrs. Pugh also stated that the deceased said he was going back home to help his family, and she was asked:

"You got the impression that he was going back to Denmark to live with his parents?"

And she said:

"Going back there to make his home, I suppose, because it was home to him. His people lived there, and he impressed me as if he was going back, just as anyone would say that they were going back to the old folks."

While she states, in response to some questions, that he stated that he expected to help his family, yet our interpretation of her testimony as a whole is that about all she heard him say was that he expected to go back; but we do not think it shows an intention to render his family any material aid.

Under the circumstances of this case we do not think the plaintiffs had a right to expect assistance from their son. He was about 26 years old. He had been away from his family for about ten years. During all that time he had contributed absolutely nothing towards the support of the family. During these ten years' absence he had sent the members of the family at different times only 140 kronen, less than $30 in our money, and these amounts were not sent to help support the family but only as presents on birthdays and holidays.

Plaintiff bought the residence in 1921 and says that he expected at that time that his son would help him pay for it. The son was killed in October, 1922. He was a soldier and during the eighteen months that he was in the World War no allotment was made from his pay to the support of his family. There is absolutely nothing in the record to indicate that plaintiffs had any reason to expect help from their son and we do not believe that they did.

Of course, any assistance from him would have been welcomed by them, but we see no reason why they should have expected assistance under the circumstances. And, as shown above, it is clear that they were not dependent upon him for support.

In support of their case, counsel for plaintiffs have cited Article 229 of the Civil Code which reads as follows:

"Children are bound to maintain their father and mother and other ascendants, who are in need; and the relatives in the direct ascending line are likewise bound to maintain their needy descendants, this obligation being reciprocal."

But, as we have seen, the parents of the deceased were not in need at the time of his death.

Counsel have also referred us to the case of Gregory vs. Standard Oil Co., 151 La. 228, 91 South. 717.

Hamilton vs. Texas Oil Co., 151 La. 692, 92 South. 301.

Heinzelman vs. Board of Commissioners, 149 La. 251, 88 South. 798.

Harris vs. Calcasieu Long Leaf Lumber Co., 149 La. 649, 89 South. 885.

All decided by the Supreme Court of this state.

And also to the cases of Hand and Wife vs. Gulf Refining Co.; and

Cauthon vs. Cypress Tank Co., 1 La. App. 100.

Both decided by this court in support of their contentions in this case.

A casual reading of these cases will disclose that no one of them was on all fours with the case at bar.

In the Gregory case, speaking of the deceased son, the court said:

"He contributed his bone and sinew, the strength of his vigorous young manhood to the cultivation of the little farm which his father had rented. A fairly good crop was raised in 1919, the one-half of which was sufficient to meet the year's bills for provisions and clothing, with a little left over to carry them through the winter. Young Roy was the main hand in the making and harvesting of that crop. The place was again rented for the year 1920 on the same terms. The last of November, or first of December, 1919, Roy left home with the consent of his parents to seek employment where wages were more attractive and he could furnish more assistance to his parents. Before leaving he told his father and mother and the owner of the farm that he would send to his father $35 each month out of his wages to assist them in employing a hand to take his place in the farm work for the coming year. He made the same statement to his sister with whom he was boarding. * * * He did not send any of his wages of the first month, except $5 to a younger brother, having borrowed that amount to pay his way seeking work. * * * The reputation which the young man had earned, as attested by his neighbors, exemplified in his devotion to his parents, and the faithful discharge of his filial duty, gave his parents every reason to expect the redemption of his promise of pecuniary assistance and to look forward to such aid when the larder, filled by the fruits of his labor of the previous year, began to get low."

In the case of Hamilton vs. Texas Oil Co., noted supra, the court said:

"The father and two sons pooled their earnings, and the same were spent in paying the family living expenses, one-half or more of the deceased, Mark Hamilton's, earnings going to pay the grocery bills, market bills for clothing, etc., for other members of the family."

And, again:

"All that was earned was used for the support of the family, and notwithstanding a most searching cross-examination and inquiry into the minutest details of the family expenditures, it did not appear that they lived extravagantly or beyond what was reasonably appropriate and necessary for their station in life."

In the case of Heinzelman vs. Board of Commissioners, supra, the court found that the father of the deceased son was a barber owning no property but making

a salary of $100 per month; his family consisted of a wife, mother-in-law and five children. He did not own his own house but lived in a house with others. None of the children earned wages, and "that he was dependent on the wages of his son which were turned over to him because he needed it. That his wife had informed him that it was necessary. That she could hardly get along with $125 or $135 per month.

In the case of Harris vs. Calcasieu Long Leaf Lumber Co., 149 La. 649, 89 South. 885, cited supra, the court said, speaking of the deceased son:

"He was under 21 years of age and was the oldest of plaintiff's seven children. The father was earning $156 per month. The deceased had been contributing approximately $44 per month to the support of the family, and to that extent the parents were dependent upon him for the family support."

In the Cauthorn case, decided by this court, we said, in speaking of the deceased son:

"When he left home, however, he promised his father that he would assist him in paying for the 126-acre tract, and a few months before his death he sent his father $100 to help him pay the first note due on the property. The letter in which the money was sent is in evidence in the record. His father, however, having some other pressing debts to pay, used this $100, with the consent of the holder of the note, to discharge them. The young man was killed a few months after the first note became due, and the proof shows that now two of the notes are due and unpaid, and the plaintiff testifies that he has no means of paying them, or the three remaining notes, or the interest or taxes. He says he relied upon his deceased son to assist him in paying for the place and was dependent upon him to that extent.

"The testimony further shows that after the young man left home he sent his father $50.00 at one time, and gave $10.00 and $5.00 at other times; that he gave his father the shoes and hat which he wore at the time of the trial, and had given him other articles of clothing—a nice jumper, and, in the words of the plaintiff, 'just such things as a boy would send home to his parents,' He also gave his sister, then a minor at school in Eldorado, $20.00 and bought her books and some clothes."

In this case the court found that the father, on the date of the trial, was 58 years old, and that his wife was 47. The father's health was fairly good, but he said that he could not do much more than a few days' plowing at a time and stated that he did not have the strength and the power and was worn out just like an old piece of machinery. The testimony showed that his wife had kidney trouble but that in other respects her health was reasonably good.

In the case of Hand and Wife vs. Gulf Refining Co., also decided by this court, the court said, referring to the assistance which the deceased son had rendered to his parents and their need thereof:

"We find that his deceased son had assisted him a short time before his death in preparing the farm for planting and cultivation that year; that he had relieved his father of the financial burden of his (the son's) further education; that he was contributing a substantial sum to the education of a young sister, and to that extent relieving his father of that financial burden; and that out of his wages he contributed something in the way of money or clothes to his father."

It will be seen that the cases cited and quoted from are easily distinguished from the case at bar.

In the instant case, we find that the father is earning a salary sufficient not only to take care of himself and family in the station in which they live in Denmark but sufficient to take care of reasonable payments on the property which he has purchased.

We therefore conclude that the plaintiffs in this case were not, at the date of the

death of their son, dependent upon him to any extent for support; and further find that the plaintiffs had no right to expect assistance from their deceased son, considering the fact that he had been away from home for about ten years and during that time had contributed absolutely nothing to their support; and that notwithstanding the fact the parents had purchased a residence in 1921 and that the son died in October, 1922, he had not contributed anything towards the payment of this debt, notwithstanding the fact that the proof shows he was earning at the time of his death $37.50 per week.

For the reasons assigned, it is ordered, adjudged and decreed that the judgment appealed from be reversed and plaintiff's demand rejected at their costs.

REYNOLDS and CARVER, J., recused